IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| ROBERT S. DOUGHERTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CIV 05-603 RB/LCS |
| | ) | |
| BRIDGESTONE/FIRESTONE, INC., | ) | |
| BFS RETAIL AND COMMERCIAL | ) | |
| OPERATIONS, L.L.C., and | ) | |
| BRIDGESTONE AMERICAS | ) | |
| HOLDINGS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on the Defendant BFS Retail & Commerical Operations, L.L.C.'s [hereinafter "BFRC"] Motion to Compel Arbitration and Dismiss Plaintiff's Complaint or, in the alternative, Stay the Proceedings (Doc. 3), filed on August 1, 2005, Defendant BFRC's Motion for Order to Transfer Venue (Doc. 5), filed on August 1, 2005, and Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7), filed on August 4, 2005.[1] Jurisdiction arises under 28 U.S.C. § 1332.[2] Having considered the parties' submissions and

---

[1]To be clear, Defendants Bridgestone/Firestone, Inc. [hereinafter "BFI"] and Bridgestone Americas Holding, Inc. [hereinafter "BAHI"] have not appeared in this proceeding. In any event, Plaintiff indicates that it "will be dismissing both" BFI and BAHI. (Pl.'s Statement Regarding Diversity Jurisdiction (Doc. 21), filed Nov. 10, 2005, at 2 (BFRC "is the correct party defendant"); Def. BFRC's Br. Supp. of Mot. to Transfer Venue at n.1(noting that Plaintiff failed to serve BAHI and stating that BFI no longer exists).)

[2]As discussed *infra*, the Federal Arbitration Act applies to this action. Jurisdiction arises, however, under 28 U.S.C. § 1332, not 28 U.S.C. § 1331, because "[t]he FAA alone cannot confer subject matter jurisdiction on the federal courts without an independent jurisdictional basis." *Comanche Indian Tribe of Okla. v. 49, L.L.C.*, 391 F.3d 1129, 1132 n.4 (10th Cir. 2004) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1,

being otherwise fully advised, I hereby grant Defendant's motions and deny Plaintiff's motion, as follows.

## I.    Background.

This case arises wholly from Plaintiff's former employment with Defendant BFRC and Defendant BFRC's predecessor entities [hereinafter "the Company"[3]] between 1999 and 2004. (Compl. ¶¶7-20.)  During his tenure with the Company, Plaintiff worked as a salesperson at their Albuquerque and Farmington, New Mexico tire stores.  (Compl. ¶8.)

Discord between the parties apparently arose in January 2001.  First, according to Plaintiff, the Company "unilaterally reduced" the size of his sales commissions.  Plaintiff alleged that this reduction violated the parties' agreement that Plaintiff "would receive a commission of 25% gross profit on his sales."  (Compl. ¶11.)

Second, Plaintiff alleged that the Company removed him, without cause, from customer accounts that he developed.  The Company's action, according to Plaintiff, arose after he repeatedly notified the Company - between 2002 and 2004 - that his customers had not received "credit for grease," which they had returned to the Company.  (Compl. ¶¶19-20.)

On or about April 1, 2004, the Company terminated Plaintiff following an investigation into his use of company credit cards and other unspecified conflicts of interest.  (Compl. ¶20.)

---

25 n. 32 (1983)). The parties' submissions, filed in response to this Court's order of November 4, 2005 (Doc. 20), make clear that there is diversity jurisdiction here: (1) "complete diversity" of citizenship exists; and (2) the amount in controversy exceeds $75,000.  *See Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 1002 (10th Cir. 2005) (citing 28 U.S.C. § 1332).

[3]"The Company" refers to Defendant BFRC, as well as any "related or affiliated entities, including any predecessor or successor entities to BFRC." (Def. BFRC's Br. Supp. Mot. to Compel Arbitration at 5, n.5.)

**II.      The EDR Plan: the parties' agreement to arbitrate.**

Plaintiff acknowledged that he assented to the Company's Employee Dispute Resolution Plan [hereinafter "EDR Plan"] - including its arbitration clause - three times over the course of his employment with the Company.[4]  Notably, however, only the parties' assent to the EDR Plan in 1999 and 2003 are at issue here.[5]

Applying to be rehired by the Company on February 12, 1999, Plaintiff signed a "Agreements and Acknowledgments by Applicant" form.  The document stated, *inter alia*, that being considered for employment was contingent upon Plaintiff agreeing to be bound by the EDR Plan, including its arbitration clause.[6]  Soon thereafter, Plaintiff signed an "Agreement and Acknowledgment of . . . [EDR] Plan" [hereinafter "1999 Acknowledgment"].  The 1999 Acknowledgment notified Plaintiff that:

> [The Company] established a program that directs *any legal disputes relating to* the application for, initiation, *termination, terms or conditions of employment to mediation and arbitration* rather than to the courts or to governmental agencies . . . . As a condition of being considered for employment by [the Company], *I agree that*

---

[4]Plaintiff acknowledged the EDR Plan, including its arbitration clause, on the following occasions:
- March 16, 1998:  Plaintiff signed a form acknowledgment of the Company's Employee Dispute Resolution Plan.
- February 12, 1999: Plaintiff, upon being rehired by the Company, signed both an "Agreement and Acknowledgments by Applicant" form, as well as an "Agreement and Acknowledgment of [the Company's][EDR] Plan."
- November 14, 2003: Plaintiff signed a "Current Employee Acknowledgment" of a July 1, 2003 amendment to the EDR Plan.

(Pl.'s Mot. for T.R.O. and Prelim. Inj. at 6-7; Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 2.)

[5]As noted Part I *supra*, Plaintiff's underlying claims arise out of his employment for the Company between 1999-2004.  To clarify, Plaintiff first went to work for Fletcher Cobre Tires Albuquerque, New Mexico store in 1995.  (Compl. ¶7.)  In January 1998, the Company acquired all Fletcher Cobre Tires stores.  On March 16, 1998, Plaintiff signed an acknowledgment of the Company's Employee Dispute Resolution Plan  [hereinafter "EDR Plan"].  Plaintiff left the Company briefly in late 1998.  The Company rehired Plaintiff in 1999.

[6]The EDR Plan, as originally enacted by the Company, became effective October 1, 1995.  (Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 4 (EDR Plan enacted Oct. 1, 1995).)

> *I will be bound by the terms of the Plan* . . . I acknowledge that I have been given the opportunity to review the Plan itself.

(Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 2 (1999 Acknowledgment) (emphasis added).)[7]

In 2003, the Company amended the EDR Plan.[8]   At that time, Plaintiff signed a form acknowledging the amended EDR Plan, which provided:

> I hereby acknowledge . . . that I have had an opportunity to review the [Company] [EDR] Plan (A July 1, 2003 Amendment to the [previous EDR Plan] . . . I also acknowledge that I have had an opportunity to review the EDR Plan.  I further acknowledge that the EDR Plan fully defines the disputes that are covered, describes the procedures for mediation and arbitration, and sets forth the remedies I may obtain.

(Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 5 ("Current Employee Acknowledgment" dated Nov. 14, 2003 and evidencing Plaintiff's signature).)

Three aspects of the EDR Plan, including its arbitration clause, are especially pertinent to the pending motions.  First, the Plan governs a broad range of "disputes."  Indeed, the Plan provides that:

> "Dispute" means a legal claim between persons bound by the EDR Plan which *relates to, arises from, concerns or involves in any way*:
> 1. This EDR Plan;
> 2. The employment of an Employee including the application for and the initiation, terms, conditions, or termination of such employment;
> 3. Any other matter arising from or concerning the employment relationship between the Employee and the Company including, by way of example and without limitation: . . .

---

[7]The cover page of the EDR Plan, acknowledged by Plaintiff in 1999 and 2003, also stated -- in capital-letter text -- that the Plan is the "exclusive means of resolving employment-related legal claims" and, that in applying for, accepting, or continuing to work for [the Company] after the effective date, individuals "agree to resolve all such claims through [the EDR Plan process], instead of through the court system or administrative agencies."  (Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 4; Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 6.)

[8]The Company did not have "actual notice" of Plaintiff's claims when it enacted the 2003 amendment because Plaintiff filed his Request for Mediation in March 2004.  Thus, it is the EDR Plan as amended in 2003 that is at issue here.

1.     Compensation, bonus, and wage and hour claims under federal, state or local statutes. . . or common law . . .

2.     Claims relating to involuntary terminations, such as layoffs and discharges, including constructive discharges . . .

3.     Claims for breach of contract (expressed or implied) . . .

(Def. BFRC Br. Supp. Mot. to Compel Arbitration, Ex. 6 at 2-3 (emphasis added).)   Second, the Plan expressly states that "proceedings and any judicial review of awards under these rules shall be governed by the Federal Arbitration Act." (Def. BFRC Br. Supp. Mot. to Compel Arbitration, Ex. 6 at 2-3.)

Third, the EDR Plan - by its terms - states that it "may be amended or terminated at any time" by the Company.  (Def. BFRC Br. Supp. Mot. to Compel Arbitration, Ex. 6 at 15.)  Yet, the Plan limits the Company's ability to unilaterally modify the Plan by specifying that:

[1] no amendment or termination shall apply to a Dispute of which [the Company] had *actual notice*, through the filing with the [American Arbitration Association] of a Request for Mediation or a Request for Arbitration, on the date of amendment or termination[; 2] [n]o amendment or termination shall be effective unless [a] approved in writing by a . . . higher official of the Company and [b] until *sixty (60) days* after written notice of such amendment or termination is sent to the American Arbitration Association and Employees . . . .

(Def. BFRC Br. Supp. Mot. to Compel Arbitration, Ex. 6 at 15 (emphasis added).)

## III.    Procedural posture.

The instant dispute has produced three court cases and two alternative dispute resolution proceedings.    First, on February 6, 2004, Plaintiff sued GCR Tire Centers, Inc. (a predecessor entity of the Company) and its agent, Richard Mason, in New Mexico state court (San Juan County).[9]

_____

[9]"GCR Tire Centers" is operated by, and is an unincorporated division of, the Company.  (Compl. ¶7.)

Plaintiff raised common law claims related to the Company's "failure[] to pay commissions and provide accountings." (Compl. ¶13.) Plaintiff voluntarily dismissed the case without prejudice on April 7, 2004 as a result of the parties entering mediation. (Compl. ¶13.)

Second, Plaintiff filed a Request for Mediation with the American Arbitration Association [hereinafter "AAA"] pursuant to the EDR Plan on March 8, 2004. Plaintiff characterized his claims as "primarily contractual in nature and involv[ing] [his] commission compensation." (Def.'s Br. Supp. Mot. to Transfer, Ex B.) Despite the parties' participation in the EDR mediation proceeding, they were unable to "come to a mutually acceptable agreement." (Def.'s Br. Supp. Mot. to Transfer, Ex B.)

Third, on September 23, 2004, Plaintiff sued the same defendants that were the subject of his first lawsuit (GCR Tire Centers and Richard Mason) in Colorado state court (La Plata County). As grounds, Plaintiff again sought relief for Defendant's alleged "failure to pay commissions and provide accountings." (Compl. ¶16.) In addition, he averred that Defendants had failed to "*meaningfully* participate in the mediation process." (Compl. ¶16 (emphasis added).)

Defendants removed the action to United States District Court for the District of Colorado. (Compl. ¶18.) Later, Plaintiff moved for a voluntary dismissal. (Compl. ¶17.) Therein, Plaintiff advised the court that he and the Company had "agreed to submit this matter to binding arbitration." (Compl. ¶17.) The court granted the voluntary dismissal without prejudice.

Fourth, on January 13, 2005, Plaintiff filed a Demand for Arbitration with the AAA against GCR Tire Centers and Mason regarding the same sales-commission claims underlying all three previous proceedings. Both parties have apparently invested resources in the arbitration, which is still

pending.[10]  For instance, according to the Company, Plaintiff and the Company have "submitted conflicts lists, selected an arbitrator, and participated in a scheduling conference with the Arbitrator." (Def. BFRC Br. Supp. Mot. to Compel Arbitration at 7.)

Fifth, on May 27, 2005, Plaintiff filed the instant action in the District of New Mexico. Plaintiff prayed for: (1) declaratory relief that the parties' arbitration agreement is not enforceable by law; (2) injunctive relief enjoining the arbitration proceedings pending resolution of the case at bar; (3) monetary relief for Defendants' alleged (i) wrongful termination, (ii) breach of contract (termination), (iii) breach of contract (wrongfully reduced sales commissions), (iv) fraud, and (v) libel and slander.[11]

## IV.   Defendant BFRC's Motion to Compel Arbitration and Dismiss Plaintiff's Complaint or, in the Alternative, Stay the Proceedings.

The Company[12] moved, pursuant to the Federal Arbitration Act [hereinafter "FAA" or "the Act"], to compel binding arbitration of the claims averred in the instant action, as outlined in the EDR Plan.[13]  Therein, the Company sought dismissal, or alternatively a stay, of the case at bar pending arbitration.  Plaintiff, conversely, argued that: (1) he is not subject to the FAA; and (2) the parties'

---

[10] The arbitration is identified as AAA No. 761600001005DE R.  The arbitration is assigned to a single arbitrator in Phoenix, Arizona.

[11] In the present action is the first time Plaintiff has attempted to litigate: (1) whether the arbitration agreement is enforceable; and (2) under a "wrongful termination" theory.  (Pl.'s Mot. for T.R.O. and  Prelim. Inj. ¶¶ 17, 20.)

[12] See supra note 3.

[13] The Company moved pursuant to FAA §§ 3-4.  FAA § 3, however, rather than FAA § 4 governs the Company's Motion to Compel.  See Williams v. Imhoff, 203 F.3d 758, 764 (10th Cir. 2000).  Cf. 9 U.S.C. § 4 (allowing parties to enforceable arbitration agreements to petition the court for an order compelling arbitration where another party refuses to arbitrate a dispute covered by the agreement).

arbitration agreement is unenforceable as a matter of law.[14]  (Pl.'s Mot. for T.R.O. and Prelim. Inj. at 11.)

Grants and denials of motions to compel arbitration are reviewed *de novo.  See Summit Contractors, Inc. v. Legacy Corner, L.L.C.*, No. 04-6276, 2005 WL 2203248, at **2 (10th Cir. Sept. 12, 2005); *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 796 (10th Cir. 1995).  Moreover, as a diversity case, "determinations of state law" made by this Court are also subject to *de novo* review. *Gibson v. Wal-Mart Stores, Inc.*, 181 F.3d 1163, 1166 (10th Cir. 1999).

### A.    Plaintiff does not fall within the statutory exception for "workers engaged in interstate commerce," and therefore, the Federal Arbitration Act governs.

Despite the fact that the EDR Plan expressly states that it is governed by the FAA, *see supra* Part II, Plaintiff maintained that he is not subject to the FAA.  Specifically, he contended that he falls within the Act's exemption for workers "actually engaged in interstate commerce."  *See* 9 U.S.C. § 1.  Plaintiff averred that, as an employee of the Company, he was:

> required to and personally transported these tires from Farmington, New Mexico to Price, Utah; Empire, Colorado; Craig, Colorado; and from and to other destinations within and without New Mexico and was an employee actually engaged in the channels of interstate commerce.

(Comp. ¶9.)

The FAA does not "cover[] 'contracts of employment of seamen, railroad employees, or *any*

---

[14]Plaintiff also argued that, in any event, this Court should not compel arbitration because the Company's Motion to Compel Arbitration, as well as its Motion for Transfer of Venue, are "premature" and "untimely." (Pl.'s Resp. to Def.'s Mot. to Compel Arbitration at 2.)  He maintained that in filing its Motion to Compel *before* being served with a copy of the Complaint, the Company violated procedural rules of motion practice: "defendant . . . can take no action with regard to the complaint until after service."  (Pl.'s Resp. to Def.'s Mot. to Compel Arbitration at 4-5.)  Put plainly, Plaintiff's position reflects a fundamental misunderstanding of personal jurisdiction and is meritless.  *See Shaffer v. Heitner*, 433 U.S. 186, 216 (1977) (" The Due Process Clause 'does not contemplate that a state may make binding a judgment . . . against an individual or corporate defendant with which the state has no contacts, ties, or relations.'") (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 319 (1945)).

*other class of workers engaged in foreign or interstate commerce*.'" *Oil Chem., & Atomic Workers, Int'l Union (AFL-CIO) v. Conoco, Inc.*, 241 F.3d 1299, 1302 (10th Cir. 2001) (quoting 9 U.S.C. § 1) (emphasis added).  Plaintiff maintained that he falls within FAA § 1's catch-all clause: "*other class of workers engaged in foreign or interstate commerce*."  *See id.*

The Supreme Court, however, has held that § 1 is far narrower than Plaintiff would have this Court believe.  Indeed, the high court ruled that § 1's residual clause ("any other class of workers . . .") is "controlled and defined by reference to the enumerated categories of workers which are recited just before it": "seamen" and "railroad employees."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (applying the *ejusdem generis* rule of statutory construction).  Accordingly,  § 1 only exempts "transportation workers[']" employment contracts.  *Id.* at 118; *McWilliams v. Logicon, Inc.*, 143 F.3d 573, 575 (10th Cir. 1998) (noting that narrow understanding of § 1 serves the "modern federal policy favoring arbitration").[15]

Here, construing the facts in the light most favorable to the non-moving party, *see Gibson*, 181 F.3d at 1166, Plaintiff does not fall within the ambit of FAA § 1.  The Company hired Plaintiff as a "salesperson."  (Def. BFRC's Resp. to Pl.'s Mot. T.R.O. and Prelim. Inj., Ex. 1.A.)  Even assuming that Plaintiff "was required to and personally transported tires" across interstate lines, that

---

[15] Congress, "it is reasonable to assume," passed § 1 because it "did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers."  *Circuit City Stores, Inc.*, 532 U.S. at 121.  Accordingly, only classes of workers that are heavily regulated by Congress under independent regulatory schemes, such as "seaman" and "railroad employees,"  fall outside the FAA.  *See id.* at 120-121 (noting that "it is a permissible inference that the employment contracts of the classes of workers in § 1 were excluded from the FAA *precisely because of Congress' undoubted authority to govern the employment relationships at issue*" and that when FAA passed in 1925 "Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers") (emphasis added).

clearly does not make him a "transportation worker" within the meaning of the exception.[16] *Accord Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286 (11th Cir. 2005) (holding, under *Circuit City Stores, Inc.*, that § 1 did not apply to an account manager at a retail store whose "job duties involved making delivery of goods to customers out of state in his employer's truck"). Accordingly, the Act and "the body of substantive law the FAA creates" govern the parties' arbitration agreement here. *See U.S. Energy Corp. v. Nukem, Inc.*, 400 F.3d 822, 829 (10th Cir. 2005).

**B.** **Plaintiff and BFRC entered into a valid arbitration agreement and, therefore, this proceeding is stayed pursuant to FAA § 3.**

**1.** **The FAA requires this Court to compel arbitration of claims that are covered by a valid arbitration agreement.**

In applicable part, FAA § 2 provides that written contracts, "evidencing a transaction involving commerce," in which the parties agree to resolve future disputes by arbitration "... *shall* be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). FAA § 3 provides that where an action is brought in federal court "upon any issue referable to arbitration under an [arbitration agreement]" the presiding judge, "upon being satisfied" that the parties agreed to arbitrate a particular issue: "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . ." *See id.* § 3 (emphasis added); *see also Ansari v. Qwest Communications Corp.*, 414 F.3d 1214, 1220 (10th Cir. 2005) ("FAA's purpose [is] to enforce private agreements, which requires rigorously enforcing agreements to arbitrate."); *Cummings v. Fedex Ground Package Sys., Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005) (FAA

---

[16]Indeed, it is self-evident that a broad understanding of § 1 would "undermin[e] the FAA's pro-arbitration purpose" by "breeding litigation" concerning the applicability of FAA § 1. *Circuit City Stores, Inc.*, 532 U.S. at 123 (internal quotations omitted).

embodies a "liberal federal policy favoring arbitration agreements.").

The Act, therefore, places written "arbitration agreement[s] 'upon the same footing as other contracts.'" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219-20 (1985) (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess., at 1 (1924)).  That is, it directs courts to compel arbitration "on issues as to which an arbitration agreement has been signed," unless there is "a ground for revocation of the contractual agreement."  *Id.* (citing 9 U.S.C. § 3) (emphasis added).

Notably, however, this "strong presumption favoring arbitration" under the Act  "disappears when the parties dispute the existence of a valid arbitration agreement."  *Dumais v. Am. Golf Corp.*, 299 U.S. 1216, 1220 (10th Cir. 2002).  Plaintiff argued that the parties' agreement is wholly unenforceable. Whether an arbitration agreement is valid under the FAA necessitates a two-part inquiry regarding whether: (1) the parties agreed to arbitrate; and (2) external legal constraints bar this Court from enforcing their contract. *See Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000). The validity of an arbitration agreement is governed by "ordinary state-law principles that govern the formation of contracts."  *Summit Contractors, Inc.*, 2005 WL 2203248, at ** 2 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

      **2.**        **The EDR Plan is a valid, enforceable arbitration agreement.**

It is undisputed that New Mexico contract law controls the case at bar.[17]  (Resp. by Pl. to Mot. to Compel Arbitration at 10 (arguing, under New Mexico law, that the EDR Plan is not an enforceable contract); Def. BFRC's Br. Supp. Mot. to Compel Arbitration at 9 (arguing, under New Mexico law, that the EDR Plan is an enforceable contract).)

---

[17]In any event, Plaintiff signed the EDR Plan in New Mexico.  *See State Farm Mut. Auto. Ins. Co. v. Ballard*, 2002-NMSC-030, ¶9, 54 P.3d 537, 539 (2002) (holding that, under New Mexico choice-of-law principles, New Mexico contract law is generally to be applied to construe contracts executed in New Mexico).

### i. The parties' arbitration agreement is a valid contract.

"Under either the FAA or [New Mexico law], a legally enforceable contract is a prerequisite to arbitration; without such a contract, parties will not be forced to arbitrate." *Heye v. Am. Golf Corp., Inc.*, 2003-NMCA-138, ¶8, 80 P.3d 495, 498 (Ct. App. 2003) (citations omitted).  To bind the parties, therefore, an arbitration agreement -- "like any enforceable contract" -- "requires evidence supporting the existence of 'an offer, an acceptance, consideration, and mutual assent.'"  *Piano v. Premier Distrib. Co.*, 2005-NMCA-018, ¶6, 107 P.3d 11 (Ct. App. 2005) (quoting *Heye v. Am. Golf Corp., Inc.*, 2003-NMCA-138, ¶ 9, 80 P.3d at 498).  Even construing any ambiguities in the EDR Plan "against the drafter," it is clear that  the EDR Plan is a contract between the Company and Plaintiff to resolve future disputes under its terms.  *See Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (citing *W. Farm Bureau v. Carter*, 1999-NMSC-012, ¶4, 979 P.2d 231, 232 (N.M. 1999)).

"Mutual assent" is established where parties to the agreement share a common understanding of the offer and acceptance.  *See DeArmond v. Halliburton Energy Servs., Inc.*, 2003-NMCA-148, ¶20, 81 P.3d 573, 577 (Ct. App. 2003).  In the case at bar, the Company offered, and Plaintiff agreed -- by signing the "1999 Acknowledgment" and the "2003 Acknowledgment" -- to be mutually bound by the terms of the EDR Plan, which provide that "any legal disputes relating to application for, initiation, termination, terms or conditions of employment" between the Company and undersigned applicant will be directed to "mediation and arbitration rather than to the courts."  (Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 6 (cover page to EDR Plan as amended in 2003); Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 1 (1999 Acknowledgment).)  The Plan defines "dispute" broadly: any claim "that may arise out of either any aspect of the consideration of my request for employment or, in the event I am employed, any aspect of my employment . . ."  (Def.

BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 6 at 2-3.)

To be enforceable, however, a "contract must [also] possess mutuality of obligation . . . [m]utuality means *both sides* must provide consideration." *Heye*, 2003-NMCA-138, ¶12, 80 P.3d at 499 (emphasis added). "A promise may be consideration for a promise if it is lawful, definite and possible." *Piano*, 2005-NMCA-018, ¶6, 107 P.3d at 14. That is, "a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do." *Heye*, 2003-NMCA-138, ¶12, 80 P.3d at 499. Notably, however, "an agreement that is subject to unilateral modification or revocation is illusory and unenforceable." *Salazar v. Citadel Communications Corp.*, 2004-NMSC-013, ¶9, 450, 90 P.3d 466, 469 (2004).

Here, the parties' "mutual promise to arbitrate" is consideration for their arbitration agreement. *See Piano*, 2005-NMCA-018, ¶¶11-14, 107 P.3d at 15-16. Both parties promised to resolve disputes under the EDR Plan instead of the courts. In addition, the EDR Plan requires the Company to cover significant costs associated with EDR Plan proceedings.[18]

Contrary to Plaintiff's position, therefore, the parties' agreement to arbitrate is not "illusory." *See Salazar*, 2004-NMSC-013, ¶9, 90 P.3d at 469. Plaintiff selectively quoted the EDR Plan in arguing that the "Amendment and Termination" provision of the EDR Plan renders the agreement invalid. While the Plan may be "amended or terminated at any time," as discussed *supra* Part III, it binds the Company by limiting the effect of modifications to *prospective* disputes. For instance, any amendments to the Plan by the Company: (1) do not become effective until 60 days after written

---

[18]For example, where EDR Plan proceedings are initiated by Plaintiff, the Company is responsible for all "administrative fees and the fees and expenses of the mediator and/or arbitrator" that exceed $100. (Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 6 ¶31.C.) Where the Company initiates proceedings, it is responsible for all such fees. (Def. BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 6 ¶31.D.)

notice of the change(s) is communicated to employees and the AAA; (2) will *never* apply to any active disputes that the Company had actual notice of – disputes that had been the subject of a filed request for mediation or arbitration.

These limits make clear that the Company *is* bound under the EDR Plan: they "constitute a significant limitation on [the employer's] right to modify, amend, or cancel such that the agreement to arbitrate is not an illusory one." *See Pierce v. Kellogg, Brown & Root, Inc.*, 245 F. Supp. 2d 1212, 1215 (E.D. Okla. 2003). The Plan's amendment and termination provision does *not* grant the Company "the unfettered right to alter the arbitration agreement's existence." *See Dumais*, 299 F.3d at 1219.

It is precisely this feature of the EDR Plan that distinguishes it, under New Mexico contract law, from invalid arbitration agreements. In *Dumais v. American Golf Corporation*, for example, the Court of Appeals for the Tenth Circuit struck down, under New Mexico contract law, an arbitration agreement that placed *no* limits on an employer's ability to modify that agreement. *See id*. at 1218. Unlike the EDR Plan, the *Dumais* agreement allowed the employer to alter the agreement at will. That is, it provided that the employer could modify the agreement, effective immediately. The *Dumais* agreement was illusory - that is, not supported by consideration - because it did not limit modifications to prospective disputes, nor did it require that employees be notified of amendments.

The EDR Plan is also distinguishable from the arbitration agreement invalidated by the New Mexico Court of Appeals in *Piano v. Premier Distribution Company*.[19] In *Piano*, the Court of

---

[19]It bears noting that the EDR Plan is not unenforceable because it provides that "all persons who . . . continue working for . . . [the Company] agree to resolve all [employment-related] disputes through the [EDR Plan]." (Def. Br. Supp. Mot. to Compel Arbitration, Ex. 6 at 1.) While an at-will employee's continued employment may not constitute consideration for an arbitration agreement under New Mexico law, *see Piano*, 2005-NMCA-018, ¶¶8-10, 107 P.3d at 14-15, here, the Company is obligated to arbitrate under the EDR Plan. Thus, the parties' mutual agreement to arbitrate is sufficient consideration to render the EDR Plan valid. *Cf. id.*

Appeals struck down an agreement which "d[id] not require [defendant employer] to seek [the plaintiff's] approval before altering" its terms. *See Piano*, 2005-NMCA-018, ¶14, 107 P.3d at 16. The court explained that the agreement was "illusory" because the employer was "'free to selectively abide by its promise to arbitrate.'" *Id.* (quoting *Heye*, 2003-NMCA-138, ¶15, 80 P.3d at 500) (emphasis added). Unlike the *Piano* agreement, however, any amendments to the EDR Plan made by the Company are only effective *prospectively* and 60 days after the Company provides employees with written notice. *See id.*

Hence, unlike the *Dumais* and *Piano* agreements, the Company's promise to arbitrate under the EDR Plan is *not* "illusory" but, rather, constitutes "consideration for Plaintiff's promise."[20] *See id.* The EDR Plan, therefore, is a contract between the parties to "'trade[] the procedures and opportunity for review'" afforded by the court system "'for the simplicity, informality, and expedition of arbitration.'" *Brown v. Coleman Co.*, 220 F.3d 1180, 1182 (10th Cir. 2000) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991)). *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985).[21]

ii.      **No legal constraints preclude enforcement of the parties' arbitration agreement.**

---

¶¶11-14, 107 P.3d at 15-16 (arbitration agreement invalid where employer free to unilaterally amend agreement at any time).

[20]Other courts -- finding arbitration agreements similar to the EDR Plan enforceable -- have distinguished the *Dumais* decision on like grounds. *See e.g. Iberia Credit Bureau, Inc. v. Cingular Wireless L.L.C.*, 379 F.3d 159, 173 (5th Cir. 2004) (applying Louisiana law and distinguishing *Dumais* because arbitration agreement provided that service provider's modifications only became effective after publication of changed terms); *Pierce*, 245 F. Supp. 2d at 1216 (applying Texas law and distinguishing *Dumais* because arbitration agreement provided that employer's modifications only applied *prospectively* and became effective only after a 10-day notice period).

[21]Notably, Judge Armijo also concluded -- in a case challenging the Company's effort to arbitrate employee claims on similar grounds -- that the EDR Plan is enforceable and distinguishable from the agreements invalidated by the *Dumais* and *Piano* courts. *See Rayburn v. Bridgestone Firestone*, No. CV-05-675 (D.N.M. Dec. 29, 2005) (Armijo, J. presiding) (Mem. Op. and Order).

Turning to the second prong of the two-part FAA inquiry, no extant legal constraints preclude enforcement of the parties' arbitration agreement. First, it is clear that arbitration agreements in the employer/at-will employee context are enforceable under the FAA. *See Circuit City Stores, Inc.*, 532 U.S. at 123-24 (FAA § 1 "exempts from the FAA *only* contracts of employment of *transportation workers*.") (emphasis added). *See also supra* Part IV.A.1. Second, the claims raised by Plaintiff -- common law claims (breach of contract, wrongful termination, libel, slander, fraud) -- are commonly resolved through arbitration. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Barker*, 2004-NMCA-105, ¶13, 96 P.3d 336, 339 (Ct. App. 2004) (tort claims arbitrable); *Monette v. Tinsley*, 1999-NMCA-040, ¶22, 975 P.2d 361, 366 (Ct. App. 1999) (contract claims arbitrable).

Third, and finally, the fact that Plaintiff himself agreed to submit his dispute with the Company to binding arbitration under the EDR Plan last year dispels any lingering ambiguity that compelling arbitration is appropriate.[22] (Def. Br. Supp. Mot. to Transfer, Ex. D (Plaintiff's voluntary motion to dismiss his second lawsuit: "Plaintiff and Defendants have agreed to submit this matter to binding arbitration").) It bears noting that, although Plaintiff alleged that he was "suckered by [the Company's] agents three times" to resolve the disputed issues out of court, Plaintiff neither details these allegations nor avers that his signature on the arbitration agreements was procured by duress,

---

[22]Plaintiff, nevertheless, maintained that he should be allowed to go forward here because this is the first time he has raised a wrongful termination claim. Plaintiff acknowledges, however, that he had an opportunity to raise such claims at the time he filed his second lawsuit in September 2004 (Colorado state court). (Pl.'s Resp. to Mot. to Transfer Venue at 6 ("Inexplicably, [Plaintiff's former counsel] did not sue for wrongful termination" in the Colorado lawsuit.)) Accordingly, Plaintiff is "bound by his former counsel's decision not to include these grounds in the complaint." *Smith v. United States*, 834 F.2d 166, 170 (10th Cir. 1987) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent.").

undue influence or other impropriety on the part of the Company.[23]  (Pl.'s Resp. to Mot. to Transfer

Venue at 6).

> ### 3.     Plaintiff's claims are within the broad scope of the EDR Plan's arbitration clause.

Plaintiff did not dispute that all his underlying claims fall within the scope of the EDR Plan's

arbitration clause.  (Pl.'s Resp. to Mot. to Compel Arbitration.)  To be sure, the parties' arbitration

agreement is "broad": it reaches "[a]ny . . . matter arising from or concerning the employment

relationship between the Employee and the Company . . ." (Def. BFRC's Br. Supp. Mot. to Compel

Arbitration, Ex. 6).  *See P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) ("The

Supreme Court has noted that such an arbitration clause, not limited to questions of contractual

interpretation, is a 'broad' one.") (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S.

395, 398 (1967)).

All of Plaintiff's claims "arise from" or "concern" his employment with the Company.  (Def.

BFRC's Br. Supp. Mot. to Compel Arbitration, Ex. 6.)  What is more, the EDR Plan expressly

contemplates that the claims raised by Plaintiff would be subject to arbitration.  Hence, the EDR

Plan's arbitration clause covers all of Plaintiff's claims underlying this lawsuit.  *See Brown v. Coleman

Co., Inc.*, 220 F.3d 1180, 1184 (10th Cir. 2000) (where an arbitration clause is deemed "broad, the

strong presumption is in favor of issues being subject to arbitration"); *P&P Indus., Inc.*, 179 F.3d at

871 (same).

---

[23]Because it is clear that the parties *expressly* agreed to submit the underlying claims to arbitration, *see infra* Part IV.B., this Court need not reach the parties' arguments concerning whether Plaintiff implicitly agreed to arbitrate.

**4.      Judicial efficiency is best served by staying, rather than dismissing, this proceeding.**

The Company sought dismissal, or alternatively a stay, of this action given the parties' pending arbitration proceeding.  As discussed *supra* Part IV.B.3., it is clear that the EDR Plan is enforceable and that Plaintiffs' claims all fall within the ambit of the Plan's broad scope.

FAA § 3 mandates that a "court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *Williams*, 203 F.3d at 764 (quoting 9 U.S.C. § 3).  The Tenth Circuit has not squarely addressed whether district courts should stay or, instead, dismiss a case where all underlying claims are subject to arbitration.  *See Adair Bus Sales, Inc. v. Blue Bird Corp.*, 25 F.3d 953 (10th Cir. 1994) (reversing district court dismissal and, instead, ordering the case stayed where entire dispute arbitrable and where defendant sought stay, not dismissal, without comment). Moreover, the question remains unsettled with courts of appeal reaching divergent conclusions.  *Compare Cont'l Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 732 n.7 (7th Cir. 2005) ("the proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings pending arbitration rather than to dismiss outright"), *Lloyd v. Hovensa, L.L.C.*, 369 F.3d 263, 269 (3d Cir. 2004) (recognizing discord in the circuits, but concluding that "the plain language of § 3 affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration."), *and Aceros Prefabricados, S.A. v. Tradearbed, Inc.*, 268 F.3d 91, 95 n.2 (2d Cir. 2002) (noting, without further comment, that "[t]he district court noted that 9 U.S.C. § 3 directs a court to stay, not dismiss, an action pending arbitration, and therefore focused only on whether it should stay the proceeding not dismiss it."), *with Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868 (8th Cir. 2004) (affirming district court's order

compelling arbitration of all claims and dismissing - rather than staying - action), *and Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) ("Notwithstanding the terms of [FAA] § 3, however, dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable").  *Cf. Fedmet Corp. v. M/V BUYALYK*, 194 F.3d 674, 676 (5th Cir. 1999) ("district courts have discretion to dismiss cases in favor of arbitration under [FAA] § 3" and, therefore, "we review the decision to dismiss for abuse of that discretion.").

Judicial efficiency is maximized by this Court retaining jurisdiction of, rather than dismissing, this case given that "there might later be grounds for reinstating it."[24]  *See Tice v. Am. Airlines, Inc.*, 288 F.3d 313, 318 (7th Cir. 2002).  *Accord Lloyd*, 369 F.3d at 269 (reasoning that the district court "has a significant role to play under the FAA *even in those instances in which [it] orders the arbitration of all claims* . . . the parties are entitled to seek the Court's assistance during the course of arbitration") (citing FAA §§ 5, 7, 9, 10, 11) (emphasis added).  Accordingly, the Company's Motion to Compel Arbitration is **granted** and this proceeding is **stayed**.

## V.    Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

Plaintiff moved to have the parties' pending arbitration proceeding stayed because the arbitration agreements are "legally unenforceable."  (Pl.'s Mot. for T.R.O. and Prelim. Inj. at 1.)  To be afforded temporary injunctive relief in the Tenth Circuit, a movant must show:

> (1) substantial likelihood of prevailing on the merits; (2) irreparable injury if the injunction is denied; (3) greater injury to the movant absent the injunction than that which the opposing party will suffer under the injunction; and (4) lack of adverseness to the public interest.

---

[24]Notably, Judge Armijo reached a similar conclusion, finding the *Lloyd* court's reasoning persuasive. *Rayburn*, No. CV-05-675 (D.N.M. Dec. 29, 2005) (Mem. Op. and Order) (concluding that best practices call for a court staying - rather than dismissing - a proceeding even where all underlying claims are arbitrable).

*Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1231 (10th Cir. 2005).  Moreover, because

Plaintiffs' motion for preliminary injunctive relief "seeks to alter the status quo" in staying pending

arbitration, the motion "'must be more closely scrutinized to assure that the exigencies of the case

support the granting of a remedy that is extraordinary even in the normal course.'"  *Id.* (quoting *O*

*Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en

banc), *cert. granted sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 125

S. Ct. 1846 (2005)).

Even reading Plaintiff's motion with the benefit of all favorable inferences, however, Plaintiff

cannot make the requisite showing for temporary injunctive relief.  Because, as discussed *supra* Part

IV.B.2., the EDR Plan is valid and enforceable, he failed to evidence a substantial likelihood of

prevailing on the merits.  Plaintiff's Motion for Temporary Restraining Order and

Preliminary Injunction is hereby **denied**.

**VI.**     **Defendant BFRC's Motion for Order to Transfer Venue Or, in the Alternative, for Costs and Fees Pursuant to Rule 41(d).**

The Company also moved to have this Court transfer the instant matter to the District of

Colorado, or alternatively, to have this Court award the Company costs and fees under FED. R. CIV.

P. 41 (d).  *See* 28 U.S.C. § 1404(a); FED. R. CIV. P. 41(d).

**A.**     **Transfer of venue is inappropriate at this time.**

Section 1404(a) provides that: "[f]or the convenience of parties and witnesses, in the interest

of justice, a district court may transfer any civil action to any other district or division where it might

have been brought."  The moving party "bears the burden of establishing that the existing forum is

inconvenient."  *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir.

1991); *see also White v. ABCO Eng'g Corp.*, 199 F.3d 140, 144 (3d Cir. 1999) ("[a] case that is the subject of a § 1404(a) transfer is unloaded onto an entirely new system").

Congress intended courts to "engage in flexible and multifaceted analys[es]" when entertaining § 1404(a) "motions to transfer within the federal system."   *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988).  Hence, district courts should consider the following factors in assessing a § 1404(a) motion:

> [1] plaintiff's choice of forum; [2] the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; [3] the cost of making the necessary proof; [4] questions as to the enforceability of a judgment if one is obtained; [5] relative advantages and obstacles to a fair trial; [6] difficulties that may arise from congested dockets; [7] the possibility of the existence of questions arising in the area of conflict of laws; [8] the advantage of having a local court determine questions of local law; and [9] all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Chrysler Credit Corp.*, 928 F.2d at 1516.

In "consideration of convenience and fairness," it is clear that a § 1404(a) transfer is not warranted at this time.  Because this proceeding is stayed pursuant to FAA § 3, *see supra* Part IV.B.4., burdening the District of Colorado with this claim while the parties are engaged in arbitration under the terms of the EDR Plan would be inappropriate.[25]

## B.      Prayer for FED. R. CIV. P. 41(d) relief is denied.

The Company, in the alternative, asked to be reimbursed for its costs and attorneys' fees incurred on account of "Plaintiff's forum shopping strategy" pursuant to FED. R. CIV. P. 41(d).  (Def. BFRC's Br. Supp. of Mot. to Transfer Venue or for Costs at 8.)  Rule 41(d) provides that:

---

[25]The Company will not be barred from renewing its § 1404(a) motion in the event the parties later resume litigation of this matter: "an action may be transferred under § 1404(a) at any time during the pendency of the case, even after judgment has been entered."  *Chrysler Credit Corp.*, 928 F.2d at 1516.

> [i]f a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant, the court may make such order for the payment of costs of the action previously dismissed as it may deem proper and may stay the proceedings in the action until the plaintiff has complied with the order.

FED. R. CIV. P. 41(d).  Therein, Rule 41(d) allows a court to "require the payment of costs in the prior action before proceeding with the second action" where a "plaintiff who once has dismissed an action in any court commences another action on the same claim against the same defendant."  9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2375 (2d ed. Supp. 2005).  The Tenth Circuit is clear that: "[u]nder the language of Rule 41(d), the decision whether to impose costs and attorney's fees is within the discretion of the trial court."[26] *Meredith v. Stovall*, No. 99-3350, 2000 WL 807355, at **1 (10th Cir. June 23, 2000) (unpublished).  Rule 41(d) awards are reviewed for "abuse of discretion."  *Id.*

There is little question that Plaintiff - whatever the reason - has engaged in forum shopping. (Compl. ¶13 (February 2004 lawsuit voluntarily dismissed without prejudice); Compl. ¶16 (September 2004 lawsuit voluntarily dismissed without prejudice).)  Therein, he has sought and obtained voluntary dismissals of two other lawsuits "based upon or including the same claim[s] against the same defendant" as those underlying the case at bar.  *See* FED. R. CIV. P. 41(d).  Yet, as noted *supra*, Rule 41(d) awards are entrusted to district courts' sound discretion.  Because the instant case is stayed pending arbitration proceedings, *see supra* Part IV.B., the Company's request for costs and fees pursuant to Rule 41(d) will not be granted at this time.[27]

---

[26]Rule 41(d) provides a remedy for "possibilities of harassment in voluntary dismissals."  WRIGHT & MILLER § 2375; *AeroTech, Inc. v. Estes*, 110 F.3d 1523, 1528 n.1 (10th Cir. 1997) ("a defendant may recover fees and costs with respect to a dismissal without prejudice [under Rule 41(a)(2)] . . .").

[27]The Company will not be barred from renewing its Rule 41(d) motion in the event that the parties later resume litigation of this matter.

Accordingly, the Company's Motion for Transfer of Venue or, in the Alternative, for Costs and Fees Pursuant to Rule 41(d) is hereby **denied**.

**IT IS SO ORDERED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

23